1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KULVINDER SINGH,                          No.  2:19–cv–1692–KJN PS

12                   Plaintiff,                 ORDER ON DEFENDANT'S MOTION
                                                FOR SUMMARY JUDGMENT
13            v.
                                                (ECF No. 66.)
14   ISABELLA GUZMAN, Administrator,
     U.S. Small Business Administration,
15
                    Defendant.
16

17          Pro se plaintiff, Kulvinder Singh (an attorney), brings this Title VII employment

18   discrimination action against the head of the U.S. Small Business Association ("SBA").[1]  Plaintiff

19   alleges that the SBA's decision not to re-hire him for a temporary attorney advisor position was

20   motivated by discrimination based on his race, religion, and national origin.  (ECF No. 15 at 4-5.)

21   The SBA now moves for summary judgment on all claims.  (ECF No. 66.)  Plaintiff opposes that

22   motion, which was fully briefed.  (ECF Nos. 78, 79.)  The court took the motion under

23   submission pursuant to Local Rule 230(g), after denying plaintiff's intervening motions to amend

24   the complaint and to extend the discovery period under Federal Rule 56(d).  (ECF Nos. 64, 72,

25   77.)  After carefully considering the written briefing, the record, and the applicable law, the court

26   GRANTS the SBA's motion for summary judgment.

27   _____

28   [1]      The parties consented to the jurisdiction of a magistrate judge for all purposes, under
     28 U.S.C. § 636(c).  (See ECF Nos. 23, 24, 30.)

1      I.      **Background**

2          This suit arises from the SBA's decision not to re-hire plaintiff in the fall of 2017 as a

3      temporary attorney advisor on its short-term regional "surge" staff which the agency hires when

4      necessary to help process federal disaster loans in the wake of natural disasters.  During the

5      SBA's "2016 Surge" from the fall of 2016 through January 2017, plaintiff worked as a temporary

6      attorney advisor at the SBA's supplemental field office in Citrus Heights, California.  After an

7      intervening period of dormancy (with no major disasters requiring extra SBA loan processing

8      assistance), in August 2017 the SBA decided to undertake another hiring surge at the Citrus

9      Heights office (the "2017 Surge").  Plaintiff—who is a man of "Asian Indian" race, Indian

10     national origin, and Sikh religion—was not re-hired for the 2017 Surge, despite sending in his

11     resume and expressing interest.  (ECF No. 15 ["FAC"] at 9.)

12          *A. Procedural History*

13         Plaintiff filed this suit in August 2019, asserting Title VII claims against the SBA and

14     Scott Reynders, an agency attorney in charge of hiring.  (ECF No. 1.)  In January 2020, the court

15     approved the parties' joint stipulation for plaintiff to file an amended complaint

16     removing Reynders as an individual defendant.  (ECF Nos. 11, 12.)  Accordingly, in February

17     2020, plaintiff filed a first amended complaint naming only the SBA and asserting alleged

18     Title VII violations for discriminatory failure-to-hire on the basis of race, religion, and national

19     origin.  (FAC at 4-5.)  The SBA answered in April 2020.  (ECF No. 16.)

20         In December 2020, the court denied the SBA's original motion for summary judgment,

21     which was brought on statute-of-limitations grounds, and simultaneously denied plaintiff's

22     motion to amend the complaint to add Reynders back in and to add a cause of action under

23     42 U.S.C. § 1981.  (ECF No. 50.)  The parties then engaged in discovery for the next year.  On

24     December 29, 2021, two days before the (extended) close of fact discovery, plaintiff filed a

25     second motion to amend the complaint—this time seeking to add a cause of action for retaliation

26     and to increase the amount of damages claimed.  (ECF No. 64.)

27         On January 18, 2022, the final day to meet the dispositive motions hearing deadline, the

28     SBA filed the instant motion for summary judgment.  (ECF No. 66.)  On February 4, 2022,

1    plaintiff responded to the summary judgment motion by moving to extend the discovery period to

2    gather additional materials in opposition, see Fed. R. Civ. P. 56(d).  (ECF No. 72.)

3          On March 23, 2022, the court denied plaintiff's related motions and reopened briefing on

4    the SBA's motion for summary judgment.  (ECF No. 77.)  In support of its motion, the SBA filed

5    an opening brief (ECF No. 66.1 ["MSJ"]), eleven exhibits and declarations (ECF Nos. 66.4–

6    66.13, 69[2]), and the requisite statement of undisputed facts (ECF No. 66.3 ["SOF"]).  Plaintiff

7    filed a combined opposition brief and declaration (ECF No. 78, ["Oppo." and "Oppo. Decl.,"

8    respectively]), along with four exhibits (ECF Nos. 78.1–78.4), a response to the SBA's statement

9    of undisputed facts (ECF No. 78.5 ["Response SOF"]), and a separate statement of disputed facts

10   (ECF No. 78.6 ["SODF"]).  With its reply brief (ECF No. 79), the SBA supplied three additional

11   exhibits (ECF Nos. 79.2–79.4), and a reply to plaintiff's Response SOF and SODF (ECF No. 79.1

12   ["Reply SOF"]).

13         In its Reply SOF, the SBA correctly notes that plaintiff's Response SOF and his SODF do

14   not comply with Local Rule 260(b).  Any party opposing a motion for summary judgment who

15   denies a fact itemized in the movant's statement of undisputed facts must "includ[e] with each

16   denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory

17   answer, admission, or other document relied upon in support of that denial."  L.R. 260(b).  In

18   addition, "[t]he opposing party may also file a concise 'Statement of Disputed Facts,' and the

19   source thereof in the record, of all additional material facts as to which there is a genuine issue

20   precluding summary judgment or adjudication."  Id.

21         Plaintiff, a licensed attorney in California for over twenty years, provides no evidentiary

22   citations whatsoever in support of the denials identified in his Response SOF and provides few

23   evidentiary citations in his SODF.  The SODF also contains no additional facts, instead

24   reproducing groups of facts from the SBA's SOF and denying/disputing them again with the

25

26   ─────────────
     2     Exhibit K (ECF No. 69) is an Excel spreadsheet of data that was too large to be saved
27   PDF format and electronically uploaded to CM/ECF.  Instead, the Excel .csv file was delivered
     on a CD which was manually lodged with the court.  The SBA also produced a copy of the Excel
28   .csv file to plaintiff.  (ECF No. 66.4, ¶ 17.)

1    same or similar language as in his Response SOF.[3]  (ECF No. 78.6.)  Those facts disputed/denied

2    without evidentiary citations in either the Response SOF or the SODF will be deemed admitted.

3    See McNally v. Eye Dog Found. for the Blind, Inc., 2011 WL 3847078, at *1 n.2 (E.D. Cal.

4    Aug. 30, 2011), citing Beard v. Banks, 548 U.S. 521, 527 (2006) ("[B]y failing specifically to

5    challenge the facts identified in the defendant's statement of undisputed facts, Banks is deemed to

6    have admitted the validity of the facts contained in the Secretary's statement.").  It would take too

7    much effort to note every fact being deemed admitted for lack of evidentiary citation, but where

8    special mention is warranted, the court does so.

9         ***B. Undisputed Facts***

10              **1.  Overview of the SBA's ODA-Legal Department & the Surges at Issue**

11              The SBA is a cabinet-level federal agency dedicated to small business.  Among other

12   things, the SBA provides counseling, capital, and contracting experience to small businesses

13   throughout the United States.  (SOF ¶ 1.)  One of the SBA's primary roles is to assist in the

14   economic recovery of communities after natural disasters, such as hurricanes, floods, tornadoes,

15   wildfires, and pandemics.  The SBA provides this assistance through its Office of Disaster

16   Assistance ("ODA").  (SOF ¶ 2.)  To help communities recover from declared disasters, the SBA

17   provides qualifying individuals and businesses with long-term, low interest loans through its

18   Disaster Loan Program.  (SOF ¶ 3.)  The SBA is headquartered in Washington, D.C., and has

19   field offices in every state.  (SOF ¶ 4.)  The ODA is also headquartered in Washington, D.C., but

20   its main loan closing and disbursing location is the Processing and Disbursement Center ("PDC")

21   in Fort Worth, Texas.  (SOF ¶ 5.)  The SBA field office located in Citrus Heights, California,

22   serves as a supplemental processing office when necessitated by disaster.  (SOF ¶ 6.)

23              The Fort Worth PDC houses the ODA's legal department ("ODA-Legal"), which reviews

24   and approves draft loan authorization approvals, ensures compliance, reviews collateral to ensure

25   that it is executed and properly perfected/recorded, and renders opinions of counsel.  (SOF ¶ 7.)

26   For large-scale disasters that cause significant property damage, ODA-Legal generally lacks the

27   _____

28   [3]      In its Reply SOF, the SBA generously consolidates and aligns plaintiff's duplicative
         responses to the SOF.

necessary permanent personnel to timely review and approve all of the loans through the Disaster

Loan Program.  (SOF ¶ 12.)  In these situations, ODA-Legal hires temporary attorney advisors to

help review and approve the loans, in what is colloquially referred to as a hiring "surge."  (Id.)

Temporary attorney advisors are hired at-will for estimated periods of time ranging from as little

as 30-60 days to longer than 6 months, depending on ODA-Legal's level of need for the particular

disaster.  (SOF ¶ 14.)

After severe storms and flooding in Louisiana in August 2016, ODA-Legal decided to

launch a hiring surge of temporary attorney advisors to operate out of the SBA's Citrus Heights

Office (the "2016 Surge").  (SOF ¶ 16.)  For the 2016 Surge, ODA-Legal hired 11 temporary

attorney advisors at the Citrus Heights Office, including plaintiff.  (SOF ¶¶ 17, 33.)  Plaintiff

worked on the 2016 Surge from October 25, 2016, until January 20, 2017, when surge operations

ended and he was let go along with all remaining temporary attorney advisors.  (SOF ¶¶ 17, 33.)

After Hurricane Harvey in August 2017 and Hurricanes Irma and Maria in September

2017, ODA-Legal launched another hiring surge in September 2017 (the "2017 Surge"), again to

operate out of the Citrus Heights Office.  (SOF ¶ 18.)  ODA-Legal hired 27 temporary attorney

advisors for that office in the 2017 Surge, which lasted until May 2018.  (SOF ¶ 19.)  Despite

applying to return for the 2017 Surge, plaintiff was not among them.

i.   Overall Hiring Process for 2016 and 2017 Surges

The hiring process for temporary attorney advisors for ODA-Legal during the 2016 Surge

and the 2017 Surge at the Citrus Heights Office was essentially the same.  Advertisements were

placed in *The Sacramento Bee* newspaper and some online job sites to recruit temporary attorney

advisors.  (SOF ¶ 20a.)  Applicants were instructed to email their resume to a general recruiting

email address, where SBA Human Resources would then ensure the applicant met the general job

qualifications:  U.S. citizenship, licensed to practice and in good standing in any state, and

sufficient years of legal experience.  (SOF ¶¶ 20b, 20c.)  Human Resources sent qualified

resumes on to the hiring manager(s) who would then decide whom to interview.  (SOF ¶ 20d.)  If

the hiring manager(s) wished to hire a candidate after the interview, they recommended the

candidate to Rob Goodson, the Assistant Center Director for the SBA's Fort Worth office to

5

obtain final approval.  (SOF ¶ 20e.)  Goodson only formally approved candidates who were recommended for hiring; he did not have any substantive input in the interviewing, recommending, or selection of candidates.  (SOF ¶¶ 21, 22.)  Those approved then began work after completing a limited 24-hour background check.  (SOF ¶¶ 20f, 20g.)

In addition to this public hiring process, ODA-Legal sometimes would preemptively invite back former temporary attorney advisors who had done good work for the ODA.  (SOF ¶¶ 24-25.)  However, previous work as a temporary attorney advisor did not guarantee consideration or employment for any future surges.  (SOF ¶ 25.)

Temporary attorney advisor applicants are never definitively rejected as candidates unless they do not meet the minimum qualifications.  (SOF ¶ 26.)  An applicant not initially hired at the start of a surge could still be hired further into the surge if staffing needs changed, and ODA-Legal has in fact done this, although not during the 2016 or 2017 Surges.  (SOF ¶¶ 26-27.)

**2.  Plaintiff's Participation in the 2016 Surge**

Plaintiff, an attorney who lives in Roseville (just north of Citrus Heights), applied to work as a temporary attorney advisor for the 2016 Surge after seeing an online advertisement for the position.  (SOF ¶ 30; FAC at 1.)  Scott Reynders, a long-time attorney advisor with ODA-Legal, was one of two hiring managers for the 2016 Surge at the Citrus Heights Office.  (SOF ¶¶ 8, 20d(i).)  On October 20, 2016, Reynders and the other hiring manager interviewed plaintiff in person, and then both recommended that he be hired for the 2016 Surge.  (SOF ¶ 31, 32.)  Because of his personal familiarity with the Sikh religion, Reynders knew at the time he interviewed and recommended plaintiff that plaintiff was Sikh, and he also thought it likely that plaintiff was Indian-American (which he is).  (Reynders Decl. ¶ 12; ECF No. 66.9 / Singh Depo. pp. 151-52.)  Plaintiff's selection was approved, and he began work on October 25, 2016, after clearing his background check.  (SOF ¶¶ 32, 33.)

Besides plaintiff, ODA-Legal hired ten other attorneys for the 2016 Surge.  (SOF ¶ 34.)  Two of the other new-hires were terminated within a week of starting, one for violating SBA substance policy and the other due to "inability to properly perform the work expected." (SOF ¶¶ 35-36; Reynders Decl. ¶ 13.)  The other eight temporary attorney-advisors worked through the

end of the 2016 Surge, along with plaintiff.  (SOF ¶ 37.)

Reynders was the ODA-Legal lead supervising attorney for the Citrus Heights Office for the 2016 Surge.  (SOF ¶ 38.)  In that role, Reynders was responsible for overseeing the work of temporary attorney advisors, receiving reports on their performance, discussing issues with their work where necessary, and ensuring that all ODA-Legal employees (including temporary attorney advisors) at the Citrus Heights Office were reviewing and approving Disaster Loan Program loans in a competent and expeditious manner.  (SOF ¶ 39.)

Joining Reynders on the leadership team at the Citrus Heights Office for the start of the 2016 Surge was Jill Ellis, a permanent attorney advisor also normally stationed in the Fort Worth PDC.  (SOF ¶ 10, 40, 42.)  Ellis conducted multi-day training sessions for all temporary attorney advisors (including plaintiff) at the Citrus Heights Office.  (SOF ¶ 41.)  She also helped temporary attorney advisors review and complete loan documentation, and she reviewed some of the work that they completed.  (SOF ¶ 41.)  Ellis remained at the Citrus Heights Office until December 9, 2016.  (SOF ¶ 42.)

Linda Wise, another permanent attorney advisor normally stationed in the Fort Worth PDC, worked in the Citrus Heights Office from October to November 2016.  (SOF ¶¶ 11, 51, 54.)  During that time, Wise was assigned to mentor/train plaintiff and another temporary attorney advisor named Donald Parks.  (SOF ¶ 52.)  In that capacity, Wise helped plaintiff and Parks learn how to perform legal work for the loan files, monitored their work to ensure that they were meeting expectations and providing quality work product, and gave feedback on their work when necessary.  (SOF ¶ 55.)

i.   Absences from Work Area

During the 2016 Surge, all of the temporary attorney advisors and the permanent attorney advisors (including supervisor Reynders) sat in cubicles in close proximity to one another on the second floor of the Citrus Heights Office.  (SOF ¶ 44; Reynders Decl. ¶ 14.)  During their time working with plaintiff, Ellis, Reynders, and Wise observed the following issues with plaintiff staying at his work station.

///

1  Ellis observed plaintiff "frequently leaving his work area for non-work related reasons"

2  and taking what she deemed to be "excessive breaks."  (ECF No. 66.6, ["Ellis Decl."] ¶ 4; SOF

3  ¶ 45.)  In support of this motion, Ellis avers, "I do not recall any other temporary attorney

4  advisors leaving the work area nearly to the degree as Mr. Singh, and I do not recall any other

5  temporary attorney advisors taking excessive breaks like Mr. Singh did."  (Ellis Decl. ¶ 4; SOF

6  ¶ 46.)  On "numerous occasions," plaintiff did not timely respond to Ellis's requests for

7  information about his loan files because he was not at his work area.  (Ellis Decl. ¶ 5; SOF ¶ 47.)

8  Because time was of the essence for many loan files, Ellis would then send other attorney

9  advisors to search for plaintiff so he could provide the needed information.  (Id.)  This disrupted

10  multiple attorney advisors' work and caused unnecessary delays in processing loan paperwork.

11  (Id.)  Ellis recalled plaintiff being told on "multiple occasions" that he needed to concentrate on

12  work, and plaintiff "consistently had issues being out of his seat" throughout the time Ellis

13  observed him.  (Ellis Decl. ¶ 5; SOF ¶ 48.)

14  Plaintiff's assigned mentor, Wise, also noticed plaintiff taking what she perceived as

15  "excessive breaks" and "repeatedly [leaving] his work area for non-work related reasons"

16  throughout her two months at the Citrus Heights Office.  (ECF No. 66.7 ["Wise Decl."] ¶¶ 3, 4;

17  SOF ¶ 55.)  Based on her observations, Wise estimates that plaintiff "was typically away from his

18  desk at least 1½ to 2 hours during the day, and sometimes more."  (Wise Decl. ¶ 4; SOF ¶ 56.)

19  This exceeded the allowance of one 30-minute lunch break and two 15-minute rest breaks per 10-

20  hour day, and according to Wise, "no other temporary attorney advisors left their work areas or

21  took breaks nearly to the extent that [plaintiff] did."[4]  (Wise Decl. ¶ 4; SOF ¶¶ 56-57.)

22  Wise spoke to plaintiff several times about the need to stay in his seat and about him not

23  completing enough loan authorization drafts.  (Wise Decl. ¶ 5; SOF ¶ 58.)  Wise also sent

24  plaintiff at least three written communications about his work habits.

---

25  [4]  Plaintiff attempts to dispute these facts by arguing, without citation to any evidence, that
26  he was only under Wise's training for two weeks, and that during that time Wise time-monitored
all breaks that he and Parks took.  (Response SOF ¶ 56; SODF at 3.)  The court deems Wise's
27  observations undisputed because of plaintiff's failure to cite any contrary record evidence.  Even
if the court were to accept plaintiff's unsupported version, however, that would only contradict
28  Wise's recollection as to two out of the roughly four weeks that she worked alongside plaintiff.

On October 31, 2016, Wise emailed plaintiff saying:

> They will start looking soon at your production and whether you are working.
>
> 15 minute break in morning and 15 minute break in afternoon
>
> 30-minute lunch unless you talk with Scott and get permission for longer lunch which means coming in earlier or staying later if there is a [full-time] PDC attorney here
>
> Try to keep working and not walk around so much or Scott [Reynders] will notice.

(Wise Decl., Ex. 1; SOF ¶ 59a.)

On November 8, 2016, Wise instant messaged plaintiff:  "I don't want you to get into trouble for not doing enough in a day.  That is all."  (Wise Decl., Ex. 2; SOF ¶ 59b.)  On November 10, 2016, Wise instant messaged plaintiff again reminding him of the breaks schedule, and warning, "You are getting behind in # of drafts as other[s] catch up."[5]  (Wise Decl., Ex. 3; SOF ¶ 59c.)  Thereafter, Wise "did not observe a meaningful change in [plaintiff]'s behavior." (Wise Decl., Ex. 3; SOF ¶ 60.)

Based on her personal observations and review of a "substantial amount" of plaintiff's work (as his mentor), Wise believes that plaintiff's absences from his work area negatively impacted his work performance and that he was not completing the expected number of reviews and tasks.  (Wise Decl. ¶ 6; SOF ¶¶ 61-62.)

Plaintiff's supervisor Reynders also observed plaintiff's repeated absences from the work area.  Reynders sat right next to plaintiff in the ODA-Legal cubicle block, and thus could easily observe plaintiff's working habits and demeanor.  (Reynders Decl. ¶ 14.)  "Throughout the entire 2016 Surge, [Reynders] observed [plaintiff] repeatedly and excessively leaving his work area" for

---

[5]    Plaintiff's attempts to dispute Wise's account of her communications with plaintiff (Response SOF ¶ 59c; SODF at 4) are both lacking any evidentiary citation and disingenuous at best.  Plaintiff testified in deposition that he received warnings from Wise that he was "low on drafts" and had an issue with "the number of drafts."  (Singh Depo. pp. 89-91, 98-102, 107.) Even if the court were to overlook plaintiff's lack of evidentiary support for this purported dispute, plaintiff cannot manufacture a material dispute of fact by contradicting his own deposition testimony.  See Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir. 2009) ("[A] party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").

what he deemed to be "non-work related reasons." (Reynders Decl. ¶ 15; SOF ¶ 65.) Reynders did not notice this same issue with any of the other temporary attorney advisors. (Id.) Like Ellis, Reynders recalled "numerous occasions" where the team needed information from plaintiff to process and approve loan files, but because he was not in his work area, other attorneys had to search the building to look for him. (SOF ¶ 66.) This occurred so often that the phrase "alright, where's Kulvinder?" (plaintiff's first name) became a running joke among some of the attorney advisors. (Reynders Decl. ¶ 15; SOF ¶ 67.) Reynders spoke with plaintiff "multiple times" about not leaving his work area for non-work-related reasons, but he saw "no meaningful long-term improvement." (Reynders Decl. ¶ 15; SOF ¶ 69.)

Plaintiff attempts to dispute Ellis's, Reynders's, and Wise's characterizations of his work area absences as excessive and not work-related by arguing that his absences were due to his need to visit the Human Resources ("HR") section of the office multiple times to correct a payroll processing issue toward the start of his employment. Plaintiff primarily cites the SBA's responses to Interrogatories 38, 39, and 42, as creating a genuine dispute of material fact in this regard. (See SODF at 3, 5.) None of them does so. Interrogatory 38 is inapposite, as it merely states that Reynders was plaintiff's sole supervisor, not Ellis or Wise. (ECF No. 66.8 at 29.) The SBA's response to Interrogatory 39 states that Wise does not recall plaintiff's payroll issue, or any conversations with plaintiff about it—though it acknowledges that calling HR would have been the proper course if plaintiff was not being paid.[6] (Id. at 30.) Interrogatory 42 asks whether Wise determined that plaintiff was meeting productivity expectations; and the SBA's answer states that while Wise would not have definitively known whether plaintiff was meeting productivity expectations, she observed plaintiff repeatedly leaving his work area for non-work related reasons. (Id. at 31.) This response corroborates, rather than contradicts, Wise's declaration.

The SBA directs the court to Interrogatory 32 as containing the response that most directly relates to the purported dispute of fact over the reasons for plaintiff's absences from his work

---

[6]     Reynders likewise testified that he was unaware of plaintiff's payroll issue during the 2016 Surge. (Reynders Depo. pp. 21-22.)

1   area.  Plaintiff's Interrogatory 32 asks for the "the date or dates or an approximation of when

2   plaintiff was authorized to visit the HR department area of the building at HR's request for

3   plaintiff to verify his bank account information with the HR department to correct the deposit

4   errors."  (Id. at 26.)  The SBA responded in relevant part that, while it does not know the exact

5   dates and times, the document production indicated that "any such communications and visits

6   would have been between November 16, 2016 (the day after the last possible pay-day for pay

7   period 22) and November 21, 2016 (when plaintiff gave [HR representative] Teddy Her a

8   completed direct deposit form to correct the payroll error)."  (Id.)  Plaintiff's own testimony

9   aligns with this timeline.  At his deposition, plaintiff testified that sometime the week of

10  November 14, 2016, he discovered he was not receiving direct deposit payments as he should

11  have been by then.  (ECF No. 79.2 / Singh Depo. p. 76.)  (November 16th was the Wednesday of

12  that week.)  Plaintiff recalled visiting HR representatives in their section of the office perhaps two

13  times the week of November 14 before then completing a new direct deposit form with HR on

14  Monday, November 21, 2016.  (Id. pp. 5-11.)  That resolved the issue, and plaintiff briefly visited

15  HR a final time after Thanksgiving to report that he had received his direct deposit and to thank

16  Mr. Her.  (Id. pp. 7-8, reporting a two-minute interaction.)  Plaintiff's declaration in opposition to

17  this motion also confirms this timeline.  (ECF No. 78, Oppo. Decl. ¶¶ 6-7.)

18       This evidence reflects that, at most, plaintiff made three visits to HR over the space of one

19  week (November 14–21, 2016), followed by a brief visit the following week.  As it must on the

20  SBA's motion for summary judgment, the court accepts these facts as true.  Even so, they do not

21  create a dispute of material fact as to the nature or purpose of plaintiff's absences from the ODA-

22  Legal work area for the surrounding periods of time.  This evidence does not contradict Ellis's

23  declaration regarding plaintiff's absences over the entire time that she overlapped with him:  from

24  October 25 (plaintiff's start date) to December 9, 2016 (Ellis's departure back to Fort Worth).

25  (See SOF ¶¶ 42, 45-48.)  Nor does it contradict Wise's declaration regarding plaintiff's work

26  habits and her reminders or warnings which were given before he learned of the payroll issue.

27  (See SOF ¶ 59, written messages from 10/31, 11/8, and 11/10/2016.)  Indeed, the SBA also cites

28  Reynders' testimony during his deposition by plaintiff, recalling that someone had to get up to

find plaintiff elsewhere in the office "at least every other day, if not more," and that plaintiff's

absence "wasn't a one-time occurrence or a ten-time occurrence. It was constant."[7]  (ECF

No. 79.3 at 9-10 / Reynders Depo. pp. 46-47.)

Thus, the court deems it undisputed that plaintiff was frequently away from his desk for

non-work related reasons throughout the 2016 Surge, except for the four occasions in late-

November 2016 when he was dealing with the payroll issue.

In "October or November 2016," Reynders was told by the Center Director of the Citrus

Heights Office, Tanya Garfield, that she had seen plaintiff wandering around her office area—

located elsewhere on the second floor of the building—"multiple times," looking at SBA

employees' desks.  (SOF ¶ 70; Reynders Decl. ¶ 16.)  Garfield asked Reynders to ensure that

plaintiff would stop entering that area, and Reynders gave that instruction to plaintiff.  (SOF ¶ 72;

Reynders Decl. ¶ 16.)  Although plaintiff identifies these as disputed facts, his deposition

testimony confirmed that Reynders told him "not to go to other areas of the building without

permission" (Singh Depo. p. 93, estimating that he received that instruction in December 2016),

and plaintiff cites no other evidence as creating a dispute of fact.  Plaintiff's attempt to dispute

that Garfield saw him in the director's area and told Reynders to keep him out likewise fails

because plaintiff does not actually deny those facts in his response, and in any event he cites no

evidence to create a dispute of fact.  (SODF at 6; Response SOF ¶ 72.)

## ii.  Work Performance Issues

In addition to noting his physical absences, Ellis, Reynders, and Wise all observed

problems with plaintiff's work product and productivity.  Ellis reviewed some of plaintiff's work

while she was at the Citrus Heights Office.  (SOF ¶ 49; Ellis Decl. ¶ 6.)  She recalled that he

---

[7]     The only other evidence that plaintiff cites purportedly on this subject is Reynders' deposition testimony at page 65, lines 10-16.  (SODF at 5, denying/disputing that Reynders spoke with plaintiff multiple times about the need to not leave his work area for non-work-related reasons.)  However, those lines of Reynders' testimony do not pertain to Reynders' discussions with plaintiff about excessive absences; rather, Reynders was answering plaintiff's question about how many times Center Director Tanya Garfield had complained to Reynders about plaintiff unnecessarily being in the executive work areas (his answer was just once).  (See ECF No. 78.4 at 10.)

"needed a lot of help and required a lot more reminders than the other temporary attorney advisors"; and, based on her experience working with large numbers of temporary attorneys over multiple surges, she would not have expected him to be re-hired for future surges after the 2016 Surge.[8]  (SOF ¶ 50; Ellis Decl. ¶¶ 6-7.)

In her time mentoring plaintiff, Wise noticed that plaintiff's work contained "an excessive number of errors—more than I recall for other temporary attorney advisors, including my other mentee, Mr. Parks."  (Wise Decl. ¶ 6; SOF ¶ 63.)  Wise judged plaintiff "a poor worker" whom she would not expect to be re-hired for future surges.  (Wise Decl. ¶ 7; SOF ¶ 64.)

On a roughly weekly basis, Erica Rivera, an attorney advisor in the Fort Worth SBA office, called Reynders to inform him of the performance of the temporary attorney advisors based on (i) data she reviewed in the SBA database, (ii) review of other more time-consuming activities (such as opinions of counsel and formal legal opinions) that were not recorded in the SBA database, and (iii) the quality of their work based on comments recorded in the SBA database and as provided by attorney advisors who reviewed their work.  (SOF ¶ 81.)  Rivera always identified plaintiff as one of the worst three performers of all the Citrus Heights Office temporary attorney advisors.[9]  (SOF ¶ 82; Reynders Decl. ¶ 24.)

The SBA manually filed with its summary judgment motion—and produced to plaintiff— an Excel spreadsheet of its database from the 2016 Surge (Exhibit K, marked US 000476, and hereafter referred to as the "Database").[10]  The Database tracks many—but not all—of the legal review activities performed by attorney advisors and temporary attorney advisors, such as

---

[8]    Although plaintiff attempts to dispute that Ellis reviewed some of his work and thought he needed more help than others, the interrogatory responses he cites in support do not show any inconsistency with SOF ¶ 49.  (SODF at 2-3; see Reply SOF ¶ 49.)

[9]    Plaintiff lacks personal knowledge to dispute this fact, provides no evidence in support, and even if he did, "an employee's own statement that he was performing at a level equal to that of other employees is not enough to raise a genuine issue of material fact[.]"  Aragon v. Rep. Silver State Disposal, Inc., 292 F.3d 654, 660 (9th Cir. 2002).

[10]    If converted to PDF format, the document would have spanned 55,000 pages, exceeding the ECF upload limit.  Therefore, a CD containing the Excel file was manually lodged with the court.  (See ECF No. 69.)

1   "drafting, obligations, and concurrences."  (SOF ¶ 73; Reynders Decl. ¶ 17.)  ODA-Legal uses a

2   point-based system to approximate the productivity of temporary attorney advisors in completing

3   these more routine types of tasks.  (Reynders Decl. ¶ 22 & Ex. 1.)  Each type of task has a point

4   value, corresponding to the anticipated number of those tasks that could be completed in an

5   hour—so the longer the activity is expected to take, the greater the point value assigned.

6   (Reynders Decl. ¶¶ 22, 23 & Ex. 1.)  Rivera used the point system to evaluate temporary attorney

7   advisor productivity from the data in the Database, and that data informed her consistent reports

8   to Reynders that plaintiff was in the bottom three performers.  (Reynders Decl. ¶ 22.)

9         According to Reynders's review of the Database for this litigation, plaintiff ended the

10  2016 Surge with a productivity ratio of 1.925 points per working day.[11]  (Reynders Decl. ¶ 25b.)

11  This was the second-worst production ratio of the nine temporary attorney advisors who

12  completed the 2016 Surge, just above Glory Mohtashami, as shown below:

13     • Laurie Alexander finished with 2.450 points per working day;

14     • Judith Cregan finished with 2.391 points per working day;

15     • Baldarasso (Bill) DiCapo finished with 2.104 points per working day;

16     • Golareh (Glory) Mohtashami finished with 1.751 points per working day;

17     • Shara Neff finished with 3.752 points per working day;

18     • Donald Parks finished with 2.096 points per working day;

19     • Richard Rogers finished with 3.110 points per working day; and

20     • Thomas Wahl finished with 2.361 point per working day.

21  (SOF ¶ 83; Reynders Decl. ¶¶ 25b–j.)

22        The Database does not record more complicated, and generally more time-consuming,

23  tasks that attorney advisors and temporary attorney advisors perform, such as opinions of counsel

24  _____

25  [11]     Plaintiff does not dispute Reynders's production ratio calculations, instead arguing in his
    Statement of Disputed Facts that his performance must have been adequate or else he would have

26  been terminated during the 2016 Surge.  (SODF at 7, citing SBA's response to Interrogatory 41.)
    The response to Interrogatory 41—stating that Ellis did not receive reports of plaintiff's

27  performance and would not know if he was meeting productivity expectations (ECF No. 66.8
    at 30-31)—is inapposite, and plaintiff cites no other evidence that would create a dispute of fact

28  as to this productivity data.

                                        14

or formal legal opinions.  (SOF ¶¶ 74, 75.)  For nearly all of their time on the 2016 Surge, Cregan, DiCapo, Mohtashami, Neff, and Rogers were given these more complicated tasks because from the start their work was "exceptional."  (Reynders Decl. ¶ 19.)  DiCapo and Mohtashami completed the majority of the opinions of counsel and formal legal opinions produced by ODA-Legal during the 2016 Surge.  (Reynders Decl. ¶¶ 19, 25.)  Plaintiff completed "a small number" of opinions of counsel in December 2016 and January 2017 (the end of the 2016 Surge period), but his work on them "was generally substandard" and took too long. (Reynders Decl. ¶ 20.)  Factoring in these non-Database-recorded tasks, plaintiff's production ratio was lower than Mohtashami's—and even further from the productivity shown by Cregan, DiCapo, Neff, and Rogers.  (Reynders Decl. ¶ 25.)

As mentioned above, the 2016 Surge ended on January 20, 2017, when all nine remaining temporary attorney advisors were let go.  (SOF ¶¶ 17, 33; Reynders Decl. ¶ 26.)

### 3.  Switchboard Phone Calls in Summer 2017

Although neither party's statement of facts refers to it, certain discovery materials attached to this motion mention an important episode in between the two Surges that informs much of plaintiff's opposition argument.  The SBA's response to Interrogatory 12 states in part that "during summer 2017, a male individual made several harassing phone calls to the Citrus Heights SBA office.  The individual was never definitively identified but was believed to be plaintiff."  (ECF No. 66.8 at 11; see Oppo. at 3.)

One of the exhibits attached to plaintiff's opposition includes a related December 7, 2017 email exchange between Center Director Tanya Garfield and the head of HR at the Citrus Heights Office, Dori Whiting (who as discussed below was involved in plaintiff's re-application for the 2017 Surge).  In response to an inquiry from an Equal Employment Opportunity ("EEO") Specialist investigating plaintiff's subsequent informal EEO complaint, Whiting emailed Garfield on December 7, 2017, asking "Do you know if [Federal Protective Services] took a report last year when [plaintiff] kept calling the switchboard asking for Susheel?"  (ECF No. 78.2 at 3, referring to an SBA employee.)  Garfield replied:  "I did report the incidents to FPS but I don't have a copy of the report, and my recollection is from the event last year was [sic] that we were

15

1    never able to identify who was making the calls and harassing our switchboard.  We only

2    suspected it was [plaintiff] Mr. Singh."  (Id.; see Oppo. at 4.)

3         Plaintiff avers that he never met Susheel Kumar and "never made any phone calls for or

4    referring to them."  (ECF No. 78, Oppo. Decl. ¶ 9.)  Likewise, Reynders testified that he never

5    heard about plaintiff making any harassing phone calls and did not know who Susheel was.

6    (Reynders Depo. pp. 42-43.)

7              **4.  Hiring for the 2017 Surge**

8         In August 2017, Reynders was notified that he would be the initial lead supervising

9    attorney for the 2017 Surge in the Citrus Heights Office, and that he would initially serve as the

10   hiring manager.  (SOF ¶ 84; Reynders Decl. ¶¶ 8, 27.)  On August 21, 2017, before traveling to

11   Citrus Heights from Fort Worth, Reynders received from an HR officer a list of all temporary

12   attorney advisors who worked the 2016 Surge; and he was asked to recommend which individuals

13   to invite back for the 2017 Surge.  (SOF ¶ 86; Reynders Decl. ¶ 28 & Ex. 2.)  Reynders emailed

14   Assistant Center Director Goodson with his recommendations within 20 minutes of receiving the

15   list.  (Reynders Decl., Exs. 2 & 3.)  Of the nine temporary attorney advisors who finished the

16   2016 Surge, Reynders recommended reaching out to seven:  Cregan, DiCapo, Mohtashami, Neff,

17   Parks, Rogers, and Wahl.  (SOF ¶ 87; ECF No. 66.4 at 25.)  Reynders recommended not

18   contacting plaintiff, Laurie Alexander, or the two 2016 hires who had been terminated within the

19   first week of the 2016 Surge; he indicated this by writing "NO" next to their names on the list.

20   (SOF ¶ 87; Renders Decl. ¶ 30; ECF No. 66.4 at 25.)

21        Reynders did not recommend re-hiring the two early-terminated 2016 hires—both non-

22   Sikh and both White—because of their previous early terminations.  (SOF ¶¶ 88-91.)  Reynders

23   did not recommend re-hiring Alexander—a non-Sikh, White woman—because her work was "not

24   very high quality" and she was not capable of competently performing more complex tasks that

25   could be necessary for the 2017 Surge.  (Reynders Decl. ¶ 30c.)

26        Conversely, Reynders recommended immediately hiring Cregan, DiCapo, Mohtashami,

27   Neff, and Rogers because they were exceptional and productive workers, proficient at both

28

                                        16

complex assignments from the start and the more basic tasks recorded in the Database.[12] (Reynders Decl. ¶ 30e.)  Reynders also recommended immediately hiring Parks and Wahl because they generally performed well, both quantitatively and qualitatively.[13]  (Reynders Decl. ¶ 30f.)

The SBA ultimately did not contact Wahl for the 2017 Surge, and of the other six 2016 attorneys whom Reynders recommended, four agreed to return:  Cregan, DiCapo, Neff, and Parks.  (SOF ¶ 96.)  From the general public, ODA-Legal received 68 applications for temporary attorney advisor positions (not including plaintiff's); and in total it hired 27 temporary attorney advisors for the 2017 Surge in the Citrus Heights Office.  (SOF ¶¶ 97-98.)  The majority of those hired were White, except for two who were African-American, one who was Latino, and two who were Asian-American.  (SOF ¶ 99; ECF No. 66.5 ["Whiting Decl."] Ex. B.)  Reynders interviewed only one person of Asian descent and recommended hiring him (and he accepted). (Reynders Decl. ¶ 35.)  The other Asian-American temporary attorney advisor was interviewed and hired after Reynders left the Citrus Heights Office.  (SOF ¶ 100).

### 5.  Plaintiff's Unsuccessful Applications

On August 31, 2017, plaintiff emailed his resume to two general SBA recruiting email addresses (only one of which was correct) and several ODA-Legal employees (including Reynders and Ellis), stating that he was available for hire.  (SOF ¶¶ 101, 102.)  Human Resources qualified plaintiff's resume, and when Reynders arrived back at the Citrus Heights Office on September 5, 2017, he was shown a copy of plaintiff's resume by Dori Whiting, head of Human Resources at the Citrus Heights Office.  (SOF ¶¶ 103-05; Reynders Decl. ¶ 32.)  Whiting showed Reynders plaintiff's resume and asked Reynders if he wanted to hire plaintiff.  (SOF ¶ 105.)  Reynders told Whiting that he did not want to hire plaintiff at that time "because he was not a very good worker, but that if we absolutely had to hire him then [he] would be okay doing so."

---

[12]    The record shows that at least Cregan, DiCapo, and Neff are White (ECF No. 66.5 at 25, 27), but the court is not told the racial identity of Mohtashami or Rogers, nor any of these individuals' religions.

[13]    Wahl is a non-Sikh, White man (Reynders Decl. ¶ 30g), and the record shows that Parks is also White (ECF No. 66.5 at 27), although his religion is not disclosed.

1 | (Reynders Decl. ¶ 32; SOF ¶ 106.)  Whiting replied that this was "good, since [plaintiff] had

2 | some post-employment conduct issues."  (Whiting Decl. ¶ 14; SOF ¶ 107.)

3 |         Plaintiff does not identify these statements of fact as disputed in his Response SOF, or in

4 | his SODF.  However, for purposes of explaining plaintiff's opposition arguments below, the court

5 | sets forth additional information about the internal conversations regarding plaintiff, found in

6 | plaintiff's responsive briefing and its attachments.  (See Oppo. at 4; SODF at 7; Response SOF

7 | at 19.)  First, plaintiff attaches to his Opposition a copy of a December 26, 2017 Report from the

8 | EEO investigation of plaintiff's complaint ("EEO Report").[14]  (ECF No. 78.1.)  Reynders and

9 | Whiting were the two principal responding officials identified in the report.  The EEO Report

10 | summarizes plaintiff's complaint that he had not been called back for rehire on the 2017 Surge.

11 | (ECF No. 78.1 at 2.)  The EEO Report then summarizes Reynders's response, stating in part:

12 |
13 |             Mr. Reynders states that personnel informed him that Counselee had
     |             a "post-employment behavior" incident that was being looked into at
     |             the time they were hiring attorneys.  He states that this type of
14 |             incident can border on the line of safety and can make people feel
     |             unsafe.

15 | (Id.)

16 |         Second, plaintiff refers to an excerpt of Reynders's deposition for the instant suit, in

17 | which plaintiff questioned Reynders about portions of the transcript of Reynders's prior EEO

18 | deposition from July 2018.  (Reynders Depo. p. 31.)  Plaintiff read in the following lines of

19 | Reynders's previous testimony to the EEO investigator:  "Well, after personnel tells me they

20 | don't want him back on campus and they have had other issues that they need to report to federal

21 | police, I was done with it."[15]  (ECF No. 78.4, Reynders Depo. p. 47:15-21.)  When asked at the

22 | present deposition what that meant, Reynders testified:

23 | ///

24 | ///

25 |

26 | [14]      As discussed below, the EEO Report is unauthenticated and contains hearsay, but the
     | court mentions it here because of its importance to understanding plaintiff's arguments.

27 |
28 | [15]      Plaintiff does not provide the actual transcript of Reynders's July 2018 EEO deposition,
     | so it is unclear what question Reynders was answering.

Exactly what it states.  Personnel, who was - - head of personnel was a GS14 [on the federal pay scale], and I was a 12 when we started out there.  If the 14 says they don't want you back, I'm done.  I don't have to argue.  I don't have to go to anybody else.  The 14 dictates, and it's their campus.

(Id., Reynders Depo. p. 47:23 – 48:3; see also p. 48:4-8, confirming that Reynders was referring to Whiting and her pay grade.)

Returning to the SOF itself, it is undisputed that Whiting did not specify to Reynders what plaintiff's post-employment conduct issues were, and Reynders did not (and still does not) know exactly what Whiting was referring to.  (Whiting Decl. ¶ 14; Reynders Decl. ¶ 32; SOF ¶ 108.) Plaintiff attempts to dispute this by citing the above-discussed deposition testimony that SBA employees did not want him back on campus (SODF at 7), but that testimony does not pertain to whether Reynders knew what plaintiff's post-employment issues were.

On September 6, 2017, the day after Reynders arrived back in Citrus Heights, plaintiff called and left a voicemail for him regarding his desire to be hired; because all employment inquiries must go through HR, Reynders did not call him back.  (Reynders Decl. ¶ 37; SOF ¶ 110.)  On September 6, plaintiff also called Linda Wise, his former mentor, to ask if the Citrus Heights Office was hiring for the 2017 Surge; Wise responded that she did not know, but that they were hiring in Fort Worth.  (SOF ¶ 111.)

The following day, September 7, 2017, plaintiff forwarded his resume to Jill Ellis as well as to an SBA employee named Dalys Wright who worked in the Citrus Heights Office call center. (SOF ¶¶ 112, 113.)  Plaintiff asked Wright if she knew who was leading the legal team, and she responded that all employment inquiries must go through HR.  (SOF ¶¶ 113, 114.)  On September 8, 2017, plaintiff forwarded to Ellis and Reynders the email he sent to Wright the previous day.  (SOF ¶ 115.)  On September 11, 2017, plaintiff re-sent his resume to Reynders, and Reynders forwarded the email to Whiting, noting "he's contacting everyone again."  (Whiting Decl. ¶ 15 & Ex. 6; SOF ¶ 116.)

Whiting responded the same day:  "Disregard.  Just keep sending them to me so that we can give to FPS [(Federal Protective Services)]."  (Whiting Decl. ¶ 15 & Ex. 6; SOF ¶ 117.) Whiting so instructed Reynders because she had learned that plaintiff was calling and emailing

19

1    SBA employees to such a degree that it could potentially be deemed harassment.[16]  (Whiting

2    Decl. ¶ 15; SOF ¶ 117.)  Viewed in the light most favorable to plaintiff, this reference likely

3    encompasses the repeated calls to the SBA switchboard over the summer, which Garfield and

4    Whiting suspected were placed by plaintiff.  Whiting ultimately never forwarded plaintiff's

5    communications to FPS because it turned out there was no need to do so.  (Id.)

6          On September 18, 2017, plaintiff again sent his resume to the general SBA hiring email

7    address; and on September 19, he forwarded that email to two SBA employees, complaining that

8    he had not received a response to his inquiries.  (SOF ¶¶ 121, 123.)

9          Reynders ran the office and served as hiring manager until September 29, 2017, when he

10    returned to the Fort Worth PDC and thereafter had no further input on hiring decisions for the

11    Citrus Heights Office's 2017 Surge.  (Reynders Decl. ¶¶ 8, 31.)

12          On November 7, 2017, plaintiff forwarded along his September 7, 2017 Dalys Wright

13    email to Wise and asked if she knew to whom to apply for temporary attorney advisor work at the

14    Citrus Heights Office; Wise responded that she did not know who handled hiring but

15    recommended he contact HR.  (SOF ¶ 124.)  The next day, plaintiff sent his resume to Wise,

16    asking her to forward it to the hiring attorney; Wise repeated that she did not know who was

17    hiring and that she could not help him.  (SOF ¶ 125.)  Wise also forwarded the email chain to

18    Reynders, writing, "Hopefully that is the end of the emails."  (ECF No. 66.7 at 15.)

19          Around November 14, 2017, a loan officer (who was not part of the legal team) came to

20    Whiting and said that she had observed an individual handing out business cards to people in the

21    parking lot.[17]  (Whiting Decl. ¶ 19; SOF ¶ 126.)  The loan officer handed Whiting one of the

22    ───────────────

23    [16]    Plaintiff attempts to dispute this by reference to Whiting's deposition testimony that she
      was "collecting the documents in case it was something or harassment or whatever that [she]

24    would give it to security."  (SODF at 8, quoting Whiting Depo p. 54:11-15.)  Plaintiff takes this
      testimony to mean that Whiting was collecting the documents "for 'the record' or the FPS."

25    (SODF at 8.)  This is a reasonable interpretation, but even so, the testimony does not contradict
      Whiting's declaration.  Whiting's declaration elaborates on this testimony to explain that she was

26    making a record in case she needed to send it to FPS.  Because this elaboration does not
      contradict her deposition testimony, the fact is deemed undisputed.

27    ───────────────

28    [17]    In a July 2018 deposition during the EEO investigation of plaintiff's complaint, an SBA
      loan officer named Karen Standifer testified that plaintiff spoke with her in November 2017 in the

                                                  20

business cards, which was a piece of paper with plaintiff's name and contact information written on it.  (Id.; SOF ¶ 126.)  Whiting took the piece of paper to the private security guard on site, Carmen Deberowley, and relayed what the loan officer had shared.  (Id.; SOF ¶ 127.)

Deberowley works for a private security company that is charged with reporting to FPS anything unusual or potentially illegal or dangerous.  (SOF ¶ 129.)  When she showed her the piece of paper, Whiting did not ask Deberowley to take any particular action or to file a report.  (Whiting Decl. ¶ 19.)  However, it appears Deberowley did prepare a written report to FPS, documenting that Whiting had notified her that plaintiff was handing out business cards to employees and that Deberowley had called in the event to FPS.  (ECF No. 78.2 at 2; Whiting Decl. ¶ 20; see ECF No. 78.3 at 5 / Whiting Depo. p. 15.)

On January 2, 2018, plaintiff filed his formal complaint of discrimination with the EEOC.  (SOF ¶ 134.)  On the form, plaintiff indicated that the issues being complained of included "False allegation of poor work performance, resume screened out for new temporary work hiring." (ECF No. 66.9 at 96.)[18]  In April 2019, after further administrative processes, an EEOC Administrative Judge found that plaintiff failed to establish that any discrimination had occurred (ECF No. 32.11), and the SBA adopted the Administrative Judge's decision as the agency's Final Order.

## II.   **Discussion**

The SBA moves for summary judgment, contending that (1) plaintiff cannot establish a prima facie case of discrimination since there is no evidence that similarly situated comparators were treated more favorably, and (2) assuming plaintiff were able to establish a prima facie case

---

parking lot of the Citrus Heights Office and handed her a piece of paper with his name and contact information on it, after lamenting that he had thus far not been rehired by ODA-Legal.  (SOF ¶¶ 130, 131; ECF No. 66.8 at 73-79.)  Standifer testified that she did not feel plaintiff's behavior was "harassing" but just that "the whole encounter was strange" and made her "uncomfortable."  (ECF No. 66.8 at 80.)  During his own deposition in this case, plaintiff confirmed that this parking lot interaction with Standifer occurred.  (Singh Depo. pp. 143-48.)  It is unclear whether it was Standifer or another SBA loan officer who reported the parking lot episode to Whiting.

[18]    ODA-Legal ceased 2017 Surge operations at the Citrus Heights Office in May 2018.  (SOF ¶ 19.)

1   of discrimination, he is unable to rebut the legitimate, non-discriminatory reasons for the SBA's

2   actions as pretext.  (ECF No. 66.1 ["MSJ"] at 11-18.)

3        *A.  Summary Judgment Standard*

4        Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary

5   judgment, identifying each claim or defense—or the part of each claim or defense—on which

6   summary judgment is sought."  Summary judgment is proper when the movant "shows that there

7   is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

8   law."  Fed. R. Civ. P. 56(a).

9        A shifting burden of proof governs motions for summary judgment under Rule 56, as

10  detailed below.  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec.

11  Litig.), 627 F.3d 376, 387 (9th Cir. 2010).  The moving party bears the initial burden of informing

12  the court of the basis for the motion, and identifying portions of the pleadings, depositions,

13  answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable

14  issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In order to meet its

15  burden, "the moving party must either produce evidence negating an essential element of the

16  nonmoving party's claim or defense or show that the nonmoving party does not have enough

17  evidence of an essential element to carry its ultimate burden of persuasion at trial."  Nissan Fire &

18  Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir.2000).  If a moving

19  party fails to carry its burden of production, then "the non-moving party has no obligation to

20  produce anything, even if the non-moving party would have the ultimate burden of persuasion."

21  Id. at 1102-03 (9th Cir. 2000) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970)).

22       If the moving party meets its initial responsibility, the opposing party must establish that a

23  genuine dispute as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith

24  Radio Corp., 475 U.S. 574, 585-87 (1986).  The opposing party must demonstrate (1) that the fact

25  in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing

26  law," and (2) that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could

27  return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

28  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

22

1  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

2  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

3  contention that the dispute exists.  See Fed. R. Civ. P. 56(c); In re Oracle Corp. Sec. Litig., 627

4  F.3d at 387 (opposing party "must show more than the mere existence of a scintilla of evidence")

5  (citing Anderson, 477 U.S. at 252).

6       "In evaluating the evidence to determine whether there is a genuine issue of fact, [the

7  court] draw[s] all inferences supported by the evidence in favor of the non-moving party."  Walls

8  v. Cent. Costa Cty. Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted).

9       ***B. Analysis***

10      Title VII forbids discrimination against federal employees or prospective federal

11  employees based on race, color, religion, sex, or national origin.  42 U.S.C. § 2000e–16(a).  "In

12  order to prevail in a Title VII case, the plaintiff must establish a prima facie case of

13  discrimination.  If the plaintiff succeeds in doing so, then the burden shifts to the defendant to

14  articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct.  If the

15  defendant provides such a reason, the burden shifts back to the plaintiff to show that the

16  employer's reason is a pretext for discrimination."  Vasquez v. Cty. of Los Angeles, 349 F.3d

17  634, 640 (9th Cir. 2003) (footnote omitted).  The SBA moves for summary judgment based on

18  plaintiff's failure to carry his burden as to both making a prima facie case and showing pretext.

19  The court finds summary judgment warranted on both fronts.

20      **1. Prima Facie Case**

21      To establish a prima facie case, the plaintiff "must offer evidence that gives rise to an

22  inference of unlawful discrimination, either through the framework set forth in McDonnell

23  Douglas Corp. v. Green, [411 U.S. 792, 802 (1973)], or with direct or circumstantial evidence of

24  discriminatory intent."  Vasquez, 349 F.3d at 640 (cleaned up).  The requisite degree of proof

25  necessary to establish a prima facie case for Title VII claims on summary judgment is "minimal

26  and does not even need to rise to the level of a preponderance of the evidence."  Wallis v. J.R.

27  Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994).

28  ///

23

1             i.   Direct or Circumstantial Evidence of Discrimination

2         One way a plaintiff may establish a prima facie case is "by providing direct evidence

3 suggesting that the employment decision was based on an impermissible criterion." E.E.O.C. v.

4 Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009). Direct evidence of discrimination is "evidence

5 which, if believed, proves the fact of discriminatory animus without inference or presumption."

6 Vasquez, 349 F.3d at 640 (cleaned up).

7         In response to this motion, plaintiff identifies no direct evidence of discrimination by

8 those involved in the 2017 Surge hiring process. Plaintiff half-heartedly points to a series of

9 "micro-aggressions" by Reynders, which the SBA's opening brief preemptively compiled from

10 portions of plaintiff's deposition testimony—the significance of which plaintiff does not bother to

11 argue for himself. (Oppo. at 6.) As expressed in the SBA's opening brief, these

12 microaggressions do not constitute direct evidence of discriminatory bias against Sikh or Indian-

13 American individuals because they constitute behavior either directed at all attorney advisors or

14 behavior unrelated to any race, national origin, or religion. (See MSJ at 15-16.)

15         Plaintiff similarly attempts to incorporate by reference the discussion in the SBA's

16 opening brief of plaintiff's deposition testimony that Reynders made racially-charged comments

17 about Vietnamese-Americans. (Oppo. at 6, citing MSJ pages 15-18 as describing all of the

18 "actions that plaintiff claims were the basis of his claim of discriminatory intent.") Even

19 assuming that these comments were made, as is required on the SBA's motion for summary

20 judgment, they were not comments about plaintiff, about his race, his national origin, or his

21 religion—as confirmed by plaintiff's testimony that none of Reynders's comments referred to

22 "Asians" overall. (Singh Depo. pp. 190-91, 198, 205.)

23         Thus, plaintiff cannot meet his prima facie burden by the direct evidence route.

24            ii.   *McDonnell Douglas* Framework / Inference of Discrimination

25         In the absence of direct evidence of discrimination, a plaintiff can still make out a prima

26 facie inference of discrimination by satisfying the four-prong McDonnell Douglas test. See

27 Vasquez, 349 F.3d at 640. To make out a prima facie case under McDonnell Douglas, the

28 plaintiff must show "(1) that he belongs to a protected class; (2) he was qualified for the position;

1    (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside

2    his protected class were treated more favorably." Leong v. Potter, 347 F.3d 1117, 1124 (9th Cir.

3    2003).  In this motion, the SBA only challenges plaintiff's ability to meet the fourth element:

4    identifying similarly situated comparators who were treated more favorably.  (MSJ at 12.)

5          "[I]ndividuals are similarly situated when they have similar jobs and display similar

6    conduct." Vasquez, 349 F.3d at 641 (footnote omitted).  Under Ninth Circuit law, coworkers who

7    "did not engage in problematic conduct of comparable seriousness" to the plaintiff's cited

8    conduct are not similarly situated to the plaintiff.  Id.  However, employees "need not be

9    identical" to qualify as similarly situated; they must simply be "similar in material respects."

10   Earl, 658 F.3d at 1114. "Materiality depends on the context and is a question of fact that cannot

11   be mechanically resolved." Id. (quotation omitted).  Whether employees are similarly situated is

12   ordinarily a question of fact.  Id. at 1116.

13         Plaintiff identifies as comparators the four temporary attorney advisors from the 2016

14   Surge who returned to work during the 2017 Surge—Cregan, DiCapo, Neff, and Parks—plus

15   Mohtashami, who was invited to return but declined.  (Oppo. at 3.)  The only comparators

16   plaintiff specifically highlights are Mohtashami and Neff, who he argues "had either production

17   numbers that were low or an overpayment payroll matter that required attention."[19]  (Id.)  At

18   1.751 points per working day, Mohtashami indeed had a lower production ratio than plaintiff's

19   1.925 for the routine tasks recorded in the SBA Database.  (Reynders Decl. ¶ 25.)  However,

20   Mohtashami (along with DiCapo) also completed most of the opinions of counsel and formal

21   legal opinions produced by ODA-Legal during the 2016 Surge—more complicated tasks that

22   were not recorded in the Database numbers—and her work on these more complicated tasks was

23   "exceptional" from the start.  (SOF ¶¶ 74, 75; Reynders Decl. ¶¶ 19, 25.)  By contrast, plaintiff

24   completed "a small number" of opinions of counsel only—and only at the end of the 2016

25   Surge—and his work on them was "substandard."  (Reynders Decl. ¶ 20.)  Plaintiff himself

26   admitted that he "did not get good at them."  (SOF ¶ 77; Singh Depo. pp. 69-70.)

27   ───────────────

28   [19]     Plaintiff does not explain what he means by this reference to "an overpayment payroll
     matter."

1    Neff, on the other hand, had the highest Database-recorded production ratio of all the

2   2016 temporary attorney advisors, at 3.752 points per working day.  (Reynders Decl. ¶ 25g.)  This

3   made Neff almost twice as productive as plaintiff on the routine tasks.  In addition, Neff also did

4   "exceptional" work on non-Database-recorded tasks.  (Reynders Decl. ¶ 19.)  By contrast,

5   Reynders's evaluation of plaintiff's work as "substandard" was shared by the two other

6   permanent attorney advisors who worked with plaintiff during the 2016 Surge.  (See Wise Decl.

7   ¶¶ 6-7, stating that plaintiff's work contained "an excessive number of errors—more than I recall

8   for other temporary attorney advisors" and he was "a poor worker"; Ellis Decl. ¶ 6, recalling

9   plaintiff needed a lot of help and required more reminders than other temporary attorneys.)

10    All of the other three attorneys who returned for 2017 also boasted Database-recorded

11   production numbers higher than plaintiff's:  Cregan at 2.391, DiCapo at 2.104, and Parks at

12   2.096.  (Reynders Decl. ¶ 25.)  Moreover, Erica Rivera's weekly reports of temporary attorney

13   performance—which factored in non-Database-recorded tasks as well—almost always named

14   plaintiff as the overall worst performer, and he was always in the bottom three.  (Reynders Decl.

15   ¶ 24.)

16    These stark differences in plaintiff's work productivity and work quality make him not

17   similarly situated in material respects to the other temporary attorney advisors who were treated

18   more favorably (that is, those invited back for the 2017 Surge).  Alexander, the one other 2016

19   temporary attorney whose work quality was also deficient (but not so deficient as to be

20   terminated), is similarly situated to plaintiff; and as a White, non-Sikh person she is outside his

21   protected classes.  However, she was not treated more favorably than plaintiff; rather, Reynders

22   also recommended not contacting her for the initial 2017 Surge hiring, and she was not re-hired.

23   (SOF ¶ 87; Renders Decl. ¶ 30; ECF No. 66.4 at 25; see ECF No. 66.5 at 20.)  From this evidence

24   that better performing attorneys were re-hired and similarly poorly performing attorneys were not,

25   a reasonable juror could not conclude that similarly situated non-Sikh, non-Indian-American

26   workers were treated more favorably than plaintiff.  See, e.g., Nelson v. Quality Food Centers,

27   Inc., 368 F. App'x 817, 819 (9th Cir. 2010) (reaching same conclusion where purported

28   comparator received higher performance reviews than plaintiff; and affirming that similarly

1    situated comparator who received substandard performance review, and was also then transferred

2    and then demoted, was not treated more favorably than plaintiff).

3         Plaintiff's prima facie case also fails on this fourth element because he cannot show that

4    any other purported comparators had similar ongoing issues with consistently being away from

5    their desks—even when excluding the week from November 14–21, 2016 when plaintiff was

6    visiting HR to correct his payroll processing issue.

7         Throughout Ellis's roughly 6 weeks overlapping with plaintiff at the Citrus Heights Office

8    (October 25 to December 9, 2016, SOF ¶¶ 33, 42)—not purely in the November payroll

9    correction week—Ellis observed that plaintiff "consistently had issues being out of his seat."

10   (Ellis Decl. ¶ 5; SOF ¶ 48.)  In Wise's roughly 4 weeks overlapping with plaintiff at the Citrus

11   Heights Office (October 25 to late November 2016, SOF ¶¶ 33, 51, 54), she estimated that

12   plaintiff was typically away from his desk at least 1½ to 2 hours during the day, far beyond the

13   allotted total 45-minute break allotment.  (Wise Decl. ¶ 4; SOF ¶ 56.)  Most definitively,

14   Reynders—who supervised the office for the entire 10-plus weeks that plaintiff worked

15   (October 25, 2016 – January 20, 2017)—observed plaintiff "repeatedly and excessively leaving

16   his work area" throughout the entire 2016 Surge.  His absences were so frequent that it became a

17   running joke among his coworkers.  (Reynders Decl. ¶ 15; SOF ¶ 67.)

18        Although plaintiff received no disciplinary action for his frequent absences from the

19   ODA-Legal work area, Reynders spoke to plaintiff "multiple times" about the problem, which

20   disrupted the time-sensitive nature of ODA-Legal's work to process loans to people and

21   businesses trying to recover from natural disasters by requiring others to leave their seats to come

22   find him.  (SOF ¶¶ 47, 66.)  Thus, the court finds that these absences and breaks amount to

23   misconduct significant enough to factor in the 'similarly situated' analysis.

24        Plaintiff provides no evidence to dispute the SBA's evidence that none of the other

25   proposed comparators shared such misconduct in common with him.  (See Ellis Decl. ¶ 4 ("I do

26   not recall any other temporary attorney advisors leaving the work area nearly to the degree as

27   Mr. Singh, and I do not recall any other temporary attorney advisors taking excessive breaks like

28   Mr. Singh did."; Wise Decl. ¶ 4 ("[N]o other temporary attorney advisors left their work areas or

27

1    took breaks nearly to the extent that [plaintiff] did."); Reynders Decl. ¶ 15.)  This disruptive

2    workplace conduct further distinguishes plaintiff from his proposed comparators.  See Vasquez,

3    349 F.3d at 641 (coworkers who "did not engage in problematic conduct of comparable

4    seriousness" to the plaintiff's cited conduct are not similarly situated to the plaintiff); Leong, 347

5    F.3d at 1124 (affirming summary judgment for lack of prima facie case where proposed

6    comparators had not "amassed a record of misconduct comparable to [plaintiff]'s"); Rieman v.

7    Evraz, Inc. NA, 848 F. App'x 306, 308 (9th Cir. 2021) (affirming summary judgment for lack of

8    McDonnell Douglas prima facie case where plaintiff's "proposed comparator did not accumulate

9    repeated unexcused, unprotected absences and was thus not similarly situated").

10        For these reasons, the court concludes that plaintiff fails to raise a triable issue that the

11    SBA treated similarly situated non-Sikh, non-Indian-American workers more favorably.  As such,

12    he is unable to establish a prima face case on his claims of discrimination.  The SBA therefore is

13    entitled to summary judgment in its favor.

14            **2.  Legitimate, Non-Discriminatory Reasons for Not Re-Hiring**

15        Alternatively, even assuming plaintiff has sufficient evidence to establish a prima facie

16    case of discrimination, he does not offer any evidence that the SBA's proffered legitimate reasons

17    for not re-hiring him were pretext for discriminatory intent.

18                    i.   Legitimate Reasons

19        Plaintiff does not dispute that the SBA has put forth legitimate reasons for not re-hiring

20    him:  his low-quality work product, low productivity, and frequent absences from the work area

21    which disrupted the department's work.  (Reynders Decl. ¶ 25d; MSJ at 13.)  Cf. Aragon v.

22    Republic Silver State Disposal Inc., 292 F.3d 654, 661 (9th Cir. 2002) (holding that poor job

23    performance qualifies as a legitimate, non-discriminatory reason for termination); Greene v. Gen.

24    Elec. Co., 857 F.2d 1477, 1477 (9th Cir. 1988) (absence without leave is legitimate reason for

25    adverse employment action).  Rather, plaintiff argues that these were not the agency's true

26    reasons for not re-hiring him, and as such raises a material issue as to whether those reasons were

27    pretext for discrimination.

28    ///

1              ii.  Lack of Pretext

2         Once the agency articulates legitimate, nondiscriminatory reasons for its decision, as it did

3    here, the burden shifts to the plaintiff to raise a genuine dispute of material fact as to pretext to

4    avoid summary judgment.  France v. Johnson, 795 F.3d 1170, 1175 (9th Cir. 2015), as amended

5    on reh'g (Oct. 14, 2015).  Similar to the prima facie case discussed above, "[a] plaintiff may

6    demonstrate pretext in either of two ways:  (1) directly, by showing that unlawful discrimination

7    more likely than not motivated the employer; or (2) indirectly, by showing that the employer's

8    proffered explanation is unworthy of credence because it is internally inconsistent or otherwise

9    not believable."  Earl, 658 F.3d at 1112–13.  "These two approaches are not exclusive; a

10   combination of the two kinds of evidence may in some cases serve to establish pretext so as to

11   make summary judgment improper."  Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1094

12   (9th Cir. 2001) (quotation omitted).

13        Plaintiff does not attempt to argue pretext based on direct evidence.  To the extent plaintiff

14   puts forth Reynders's microaggressions and stray comments about Vietnamese-Americans

15   mentioned above, the court rejects these as direct evidence for the reasons already stated.

16        Having taken the circumstantial route, the SBA argues, plaintiff must offer evidence that

17   is "both specific and substantial" to demonstrate pretext, describing this as a "heightened

18   evidentiary burden."  (MSJ at 13, quoting Villiarimo, 281 F.3d at 1062; Sanchez v. Paramount

19   Farming Co., 2005 WL 2739171, at *6 (E.D. Cal. Oct. 21, 2005).  However, more recently the

20   Ninth Circuit has noted that "[t]here is some question whether [the "specific" and "substantial"]

21   distinction for circumstantial evidence is valid" and cautioned that the "'specific and substantial'

22   standard 'is tempered by our observation that a plaintiff's burden to raise a triable issue of pretext

23   is hardly an onerous one.'"  France, 795 F.3d at 1175 (quoting Earl, 658 F.3d at 1113).  When the

24   plaintiff relies on a combination of direct evidence and circumstantial evidence to show pretext,

25   the court "treat[s] the direct and circumstantial evidence alike," and considers both types of

26   evidence cumulatively.  Id. (quotations omitted).

27        To show pretext, plaintiff challenges the credibility of the SBA's above proffered reasons

28   for not re-hiring him, arguing that the SBA's only initial reason for not rehiring him—as

                                    29

1   purportedly conveyed to the EEOC during its investigation—was that he had post-employment

2   behavior issues that caused Citrus Heights management to not want him back on campus;

3   whereas, the SBA now offers his poor work performance as its reason.  (Oppo. at 7.)

4        The court rejects plaintiff's attempt to cherry-pick portions of the EEO investigation

5   record to make it appear that Reynders's only original reason for not re-hiring plaintiff was,

6   essentially, that personnel/HR told him not to.  The December 2017 EEO Report's summary of

7   Reynders's response to plaintiff's informal complaint, if offered for its truth, is inadmissible

8   hearsay; and the Report is unauthenticated.  Even if the court were to consider it, however,

9   Reynders's purported reference to being informed that plaintiff "had a 'post-employment

10  behavior' incident that was being looked into" almost certainly refers to plaintiff's November

11  2017 SBA parking lot visit, given the singular phrasing and the relative proximity of that incident

12  to the date of the Report.  Temporally speaking, plaintiff's parking lot visit could not have been

13  the reason that Reynders decided against hiring plaintiff some 2-3 months earlier in August and

14  September 2017.

15       Further, to the extent that Reynders's present deposition testimony indicates any deference

16  to local HR lead Dori Whiting not wanting plaintiff back on campus, there is no evidence that this

17  was Reynders's original reason for deciding against re-hiring plaintiff—nor is it clear that

18  Reynders was testifying that Whiting's sentiments were part of his "reason" at all.  (See ECF

19  No. 78.4, Reynders Depo. pp. 47-48.)  There is simply no context provided for the lines of

20  Reynders's July 2018 EEO deposition testimony being discussed, so it is entirely possible that

21  Reynders was explaining his reaction to Whiting later mentioning plaintiff's post-employment

22  issues, after he had already decided not to recommend re-hiring plaintiff due to his poor work

23  performance.

24       This becomes the only reasonable conclusion to be drawn when considered alongside the

25  undisputed fact that Reynders first decided on August 21, 2017—before arriving in Citrus

26  Heights, within the space of 20 minutes, and with no other identifiable input—to affirmatively

27  recommend not hiring plaintiff when asked by a different HR officer about contacting past

28  temporary attorney advisors.  (SOF ¶ 86; Reynders Decl. ¶ 28, Exs. 2 & 3.)  Plaintiff offers no

1  evidence that that August 2017 decision was based on anything other than Reynders's poor

2  impression of how plaintiff worked and conducted himself in the 2016 Surge.

3      To cap things off, plaintiff himself contemporaneously acknowledged that his "poor work

4  performance" was originally at least one of the reasons for not re-hiring him.  In his formal EEO

5  complaint of discrimination, filed on January 2, 2018—seven days after the EEO Report—

6  plaintiff explicitly contests a "[f]alse allegation of poor work performance" that caused his

7  resume to be screened out.  (ECF No. 66.9 at 96.)  Thus, plaintiff fails to show a material dispute

8  of fact as to Reynders's original reasons for not re-hiring him.

9      The court understands plaintiff's main argument to be that a jury could conclude that

10  Reynders maintained his stance against hiring plaintiff deeper into the surge hiring period because

11  he had been influenced by either Whiting or Center Director Tanya Garfield, who in turn were

12  biased against plaintiff because they (mistakenly, according to plaintiff) believed that he had been

13  harassing the SBA switchboard operators, purely due to his South Asian name.  (Oppo. at 3-5, 6.)

14  Plaintiff describes this as "an example of Cat's Paw theory of illegal discrimination."  (Id. at 5.)

15  The referenced "cat's paw" theory provides that "even if a subordinate employee with bias was

16  not the final decisionmaker, the plaintiff can establish a causal link by proving that 'the biased

17  subordinate influenced or was involved in the decision or decisionmaking process.'"  France, 795

18  F.3d at 1175 (quoting Poland v. Chertoff, 494 F.3d 1174, 1182–83 (9th Cir. 2007)).  Even

19  assuming that the "cat's paw" theory applies in this scenario where none of the actors involved

20  are subordinate to one another, the problem for plaintiff remains that he has not shown any of

21  them to be biased against people of South Asian descent (or people who are Indian-American or

22  followers of the Sikh faith).

23      The one email chain plaintiff provides—of Garfield informing Whiting, in response to the

24  EEO investigator's query, that "[w]e . . . suspected it was Mr. Singh" placing the numerous

25  switchboard calls (ECF No. 78.2 at 3)—does not create a material dispute of fact as to whether

26  plaintiff's non-hiring was racially motivated.  At best, it shows that some high-level officials at

27  the Citrus Heights Office honestly suspected that plaintiff was harassing their employees over the

28  summer of 2017.  Although plaintiff denies having ever made any phone calls to or referring to a

31

Susheel Kumar (Oppo. Decl. ¶ 9), "it is not important" whether an employer's reasons for taking

an adverse action "were objectively false." Villiarimo, 281 F.3d at 1063.  All that is required is

"that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial

or even baseless." Id. (quotation omitted).  Therefore, even assuming Garfield or Whiting passed

along their suspicion to Reynders, and that it informed his ongoing decision not to recommend

hiring plaintiff, that would not be enough for a reasonable juror to infer that plaintiff was not

hired because of bias against people of his race, religion, or national origin.  All it would show is

that the SBA did not hire someone its hiring officials believed to have placed harassing phone

calls, and believed to be a generally poor worker.

As plaintiff highlights in his opposition, relatively little is known on this record as to how

it might have come about that some SBA officials believed he was the switchboard caller.  (See

Oppo. at 2, listing purported material issues on this subject.)  However, as the court held in its

order denying leave to continue discovery and denying leave to add a retaliation claim, the time

for uncovering those facts was during the allotted discovery period.  (See ECF No. 77 at 15-16,

noting that "Plaintiff had an adequate opportunity to discover information about Ms. Garfield's

role in (mis)identifying him as the 2017 caller or influencing the hiring decision during the five

months following the SBA's document production," and that the time for digging into the

harassing phone calls being associated with plaintiff was "during the discovery period.")

Plaintiff now offers only his pure conjecture that a mistaken name-association was

responsible for Garfield and Whiting suspecting plaintiff to be the caller.  He posits that from

there a "jury would be able to detect facts that would lead a reasonable person to believe someone

or some people at the SBA iindicated [sic] a bias against South Asians." (Oppo. at 6.)  The court

cannot see how a jury would be able to "detect" such facts when none are revealed by the

evidence of record—and the time for unearthing more facts has already passed.

Notwithstanding plaintiff's speculation, all of the actual evidence provided on either side

of this motion supports the veracity of the SBA's justification that plaintiff's work performance

and behavior at work was the reason he was not re-hired.  First, the SBA uniformly decided not to

invite back those 2016 Surge employees whose work was substandard—including both plaintiff

and Alexander, who is a White, non-Sikh woman.  See Snead, 237 F.3d at 1094 (evidence

showing that "at least one other similarly situated employee [] was treated in a similar manner as

[plaintiff] thereby negat[ed] any showing of pretext").  Second, even assuming Reynders

harbored some undemonstrated bias against plaintiff due to his race, religion, or national origin,

there is absolutely no dispute in the record that plaintiff's work performance—including quality

of work, quantity of work, and behavior at work—was in fact substandard.  Both of the other

permanent attorney advisors (besides Reynders) stationed in the Citrus Heights Office during the

2016 Surge felt that plaintiff was not performing as well as his peers.  See Wexler v. Jensen

Pharms, Inc., 739 F. App'x 911, 913-14 (9th Cir. 2018) ("The evidence that multiple managers

were aware of [plaintiff]'s performance and agreed that he was not performing competently,

shows that [defendant]'s reason for terminating [plaintiff]—his poor performance—was not a

pretext, even if [his supervisor] was biased[.]").[20]  This aligned with Reynders's own personal

observations, as well as the reports he received from Erica Rivera, who regularly reviewed all

temporary attorney advisors' output from both a quantity and quality standpoint.  (SOF ¶ 81.)

Finally, the lack of similarity between plaintiff's 2016 Surge work conduct and his purported

comparators'—as outlined above in the prima facie failings—further cements the lack of any

triable issue of fact regarding pretext.  See Siazon v. Hertz Corp., 847 F. App'x 448, 450-51 (9th

Cir. 2021) (holding that because purported comparators did not have a demonstrated "history of

similar performance issues," they were not similarly situated and there was no triable issue of

---

[20]     In an abundance of caution, the court does not accept the SBA's invitation to apply the employer-friendly "same-actor inference" that courts must take into account on a summary judgment motion when the same person is responsible for both the positive and negative employment actions at issue.  (See MSJ at 14, citing Coghlan v. Am. Seafoods Co. LLC., 413 F.3d 1090, 1096-98 (9th Cir. 2005).)  "[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff"—which has since been expanded to cover other comparable positive and negative actions—"and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action."  Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270-71 (9th Cir. 1996).  Here, Reynders was not the sole decisionmaker in either hiring plaintiff for the 2016 Surge or not hiring him for the 2017 Surge.  He and another attorney advisor both interviewed plaintiff and both recommended that he be hired, with Rob Goodson giving the final approval for 2016.  (Reynders Decl. ¶ 11.)  And, given the involvement of both Reynders and Whiting in the ongoing decision not to hire plaintiff for 2017, the court finds the inference unwarranted.

1     pretext).  Plaintiff fails to show that the SBA's reasons for not re-hiring him are "internally

2     inconsistent or otherwise not believable."  <u>Earl</u>, 658 F.3d at 1113.

3        For these reasons, the court concludes that plaintiff fails to raise a triable issue as to

4     pretext.  The SBA therefore is entitled to summary judgment in its favor on this alternative basis,

5     as well.

6                              **<u>ORDER</u>**

7        Accordingly, IT IS HEREBY ORDERED that:

8       1.  Defendant's motion for summary judgment (ECF No. 66) is GRANTED;

9       2.  The Clerk of Court shall enter judgment in favor of defendant Guzman, as the head of

10           the U.S. Small Business Association, and CLOSE this case.

11     IT IS SO ORDERED.

12     Dated:  September 30, 2022

14     KENDALL J. NEWMAN
    UNITED STATES MAGISTRATE JUDGE

sing.1692

34